**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

———————————————————— :
                                     :
KADRI M. ATALAY,                     :        Civil No. 09-0139 (NLH)
                                     :
            Petitioner,              :
                                     :                **OPINION**
        v.                           :
                                     :
J. GRONDOLSKY,                       :
                                     :
            Respondent.              :
———————————————————— :


  **APPEARANCES:**
  James S. Friedman, Esq.
       Law Offices of James S. Friedman, LLC
       Newark, NJ  07102
  *Counsel for Petitioner*

  Paul J. Fishman, Esq.
  United States Attorney for the District of New Jersey
  Jafer Aftab, Esq.
  Assistant United States Attorney
       Office of the United States Attorney
       Newark, NJ  07102
  Christine Saetta Clark, Esq.
  Attorney Advisor
       Federal Bureau of Prisons
       Of Counsel and joining on the brief
  *Counsel for Respondent*

**Hillman, United States District Judge**:

     This matter comes before the Court upon Petitioner's

application submitted pursuant to 28 U.S.C. § 2241 ("Petition").

See Docket Entry No. 1.  Petitioner duly submitted his filing

fee.  See id.  This Court directed Respondent to answer the

Petition, and Respondent duly complied.  See Docket Entries Nos.

2 and 7.  Petitioner duly submitted his traverse.  See Docket Entry No. 8.

For the reasons detailed below, this Court will deny the Petition.

## I.   FACTUAL BACKGROUND

Petitioner's application and traverse, as well as Respondent's answer, are silent as to the circumstances of the underlying offense.  It appears from the pleadings that Petitioner pled guilty in the District of Columbia to involuntary manslaughter, with other charges being withdrawn by agreement. See Docket Entry No. 7, at 1, 6 ("Pursuant to a plea agreement, petitioner was convicted of the lesser included offense of Involuntary Manslaughter, in violation of D.C. Code Ann. § 22-2105, and Driving Under the Influence, in violation of D.C. Code Ann. § 50-2201.05(b)(1)"; "Petitioner was sentenced by the Superior Court of the District of Columbia . . . to a 40-month term of imprisonment with a consecutive five-year term of supervised release").

After his conviction and sentence and upon being taken into custody by the Federal Bureau of Prisons ("BOP"), Petitioner "enrolled in the BOP's Residential Drug Abuse Program [('RDAP')], but has been denied eligibility for the early release provided in § 3621(e)."  Docket Entry No. 1-1, at 5.  Having duly exhausted

his administrative remedies, Petitioner is now challenging that denial.  See generally, Docket Entries Nos. 1 and 1-1.

Petitioner contends as follows: (a) the BOP erroneously qualified, for the purposes of its RDAP analysis, the crime of involuntary manslaughter as a violent crime; (b) the errors in such BOP qualification amount to abuse of discretion in light of the mandate of the relevant statutory provisions; (c) presenting an abuse of discretion, the aforesaid BOP qualification falls outside the deference due to agency determinations under the holding of Chevron U.S.A. Inc. v. Nat'l Resources Defense Council, Inc., 467 U.S. 837 (1984); and (d) even if the BOP qualification did not present an abuse of discretion, it is constitutionally invalid -- under the Ex Post Facto Clause -- being based on the language of a certain provision that has undergone amendment since the time of Petitioner's underlying criminal offense.[1]  See generally, Docket Entry No. 1-1, at 6-14.


## II.  STATUTORY BACKGROUND

### A.  RDAP

We start with a discussion of the RDAP program and its relation to inmates who, like Petitioner here, are serving their

---

[1] In addition, Petitioner's submission incorporates a discussion as to why the Administrative Procedure Act ("APA") does not bar this Court's instant review.  Since Respondent does not assert any point to the contrary and we discern no reason to raise this issue *sua sponte*, we decline to address it.

non-federal sentences in federal correctional institutions by the virtue of being convicted and sentenced by the courts of the District of Columbia.

In 1990, Congress charged the BOP with making available "appropriate substance abuse treatment for each prisoner the Bureau determines has a treatable condition of substance addiction or abuse." 18 U.S.C. § 3621(b). To carry out that requirement, as part of the 1994 Violent Crime Control and Law Enforcement Act, Congress amended Section 3621 to require the BOP, subject to the availability of appropriations, to provide residential substance abuse treatment for all "eligible" prisoners. See 18 U.S.C. § 3621(e)(1)(C). An "eligible" prisoner is one who is "determined by the Bureau of Prisons to have a substance abuse problem," and who is "willing to participate in a residential substance abuse treatment program."[2] 18 U.S.C. § 3621(e)(5)(B)(I) and (ii). As an incentive for successful completion of the residential treatment program, the

---

[2] In order to qualify for participation in the RDAP, an inmate must meet all of the following criteria: (a) he must have a verifiable documented drug abuse problem; (b) he must have no serious mental impairment which would substantially interfere with or preclude full participation in the program; (c) he must sign an agreement acknowledging his program responsibility; (d) he must be within thirty-six months of release; and (e) the security level of the residential program institution must be appropriate for him. See 28 C.F.R. § 550.53. Since Petitioner was allowed to participate in the local RDAP, the Court presumes that Petitioner met the entire criteria required by the regulation.

period of time a prisoner convicted of a nonviolent offense remains in custody after successfully completing such a treatment program may be reduced up to one year by the BOP.  See 18 U.S.C. § 3621(e)(2).[3] The correlation between the RDAP program and the incentive existed ab initio.[4]

---

[3] The fact that the one-year reduction was incorporated in 18 U.S.C. § 3621(e)(2) as an incentive rather than a right is often misunderstood.  Indeed, the public policy underlying the provision is not a legislative promise to sentence those with substance abuse problems to a lesser term of imprisonment in the event they commit criminal offenses; it is rather a rehabilitation tool offered to those who meet the criteria and, in addition, qualify for the incentive granted pursuant to the BOP's good faith discretion.

   Petitioner misreads both the language and the goal of
   Section 3621(e)(2): the provision was enacted not to
   offer a reward, in the form of reduced prison sentence,
   to those offenders who committed their criminal acts
   while abusing controlled substances but to offer a
   life-straightening opportunity to those persons who,
   upon their entry into a "controlled environment" suffer
   of the ill of drug abuse.

Scott v. FCI Fairton, 2009 U.S. Dist. LEXIS 44304, at **24-25 (D.N.J. May 22, 2009) (citing Reuven Cohen, Treating and Releasing the Mule: the Rational, Non-discriminatory Provisions of 18 U.S.C.3621, 7 S. Cal. Interdis. L.J. 255 (1998) (discussing the history and legislative challenges of RDAP and noting that the final goal of RDAP focuses "on skills the inmate will need to handle and anticipate problems which may emerge upon reintegration to the community through a halfway house, home confinement, or directly into the general population")).

[4] Section 3621(e)(2)(B) provides as follows: "The period a prisoner convicted of a nonviolent offense remains in custody after successfully completing a treatment program may be reduced by the Bureau of Prisons, but such reduction may not be for more than one year from the term the prisoner must otherwise serve." Congress did not define the term "prisoner convicted of a nonviolent offense."  In a first attempt to construe the statute, the BOP promulgated a Regulation, which defined the term

The same, however, did not apply to a unique group of inmates who, as a result of being sentenced by the District of Columbia courts, were bound to serve their non-federal-crime-based sentences in federal correctional institutions.  As Respondent correctly observes, 28 C.F.R. § 550.58, as initially promulgated, provided an automatic exclusion from the RDAP of all inmates serving their D.C. Code-based sentences in federal custody, see 28 C.F.R. § 550.58 (1995), and that blanket exclusion was lifted as a result of District of Columbia legislation, approved on May 24, 2005, allowing inmates serving D.C. Code-based sentences to participate in the RDAP but only upon condition that each so-eligible inmate is "[a] person sentenced to imprisonment . . . for a 'nonviolent offense'" where

---

"nonviolent offense," as employed in Section 3621(e)(2)(B), in the negative, by incorporating the following statutory definition of "crime of violence": "An inmate who completes a residential drug abuse treatment program during his or her current commitment may be eligible for early release by a period not to exceed 12 months, in accordance with paragraph (a) of the section . . . unless the inmate's current offense is determined to be a crime of violence as defined in 18 U.S.C. § 924(c)."  28 C.F.R. § 550.58.  According to 18 U.S.C. § 924(c)(3), the term "crime of violence" is defined as:

> [A]n offense that is a felony and --
>
> (A)   has an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B)   that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

"the term 'nonviolent offense' means any crime other than those included within the definition of 'crime of violence' in D.C. Code § 23-1331(4)."  D.C. Code § 24-403.01(d-1).  Accordingly, starting January 2, 2008, the BOP implemented interim procedures allowing inmates serving D.C. Code-based sentences to participate in RDAP.

However, prior to that date and presumably with the knowledge of the effective date of the interim procedures, the District of Columbia amended D.C. Code § 23-1331(4). Specifically, prior to April 24, 2007, Section 23-1331(4) designated only "voluntary manslaughter" as a "crime of violence," but -- on April 24, 2007 -- the qualifier "voluntary" was removed by the legislators, hence broadening the definition of "crime of violence" to encompass both voluntary and involuntary manslaughter.  See Vargas-Sarmiento v. U.S. D.O.J., 448 F.3d 159, 173 n.9 (2d Cir. 2006) (discussing D.C. Code § 23-1331(4) in light of 18 U.S.C. § 3559(c)(2)(F), which specified that voluntary manslaughter was not just a mere "crime of violence" but a "*serious* violent felony,").  Consequently, Section 23-1331(4), as it stands now, utilizes the plain term "manslaughter" to define possible crimes of violence, and that the conspicuous removal of the qualifier "voluntary" by the legislators suggests an express intent to include both voluntary and involuntary manslaughter in the Section 23-1331(4) definition

Page 7 of  24

of the term "crime of violence."   See United States v. Rivera,
131 F.3d 222, 234 (1st Cir. 1997) (Torruella, C.J., concurring)
(noting that "in the usual kind of amendatory legislation, a
change of language is intended to change substance") (citation
and internal quotation marks omitted).

   B.   **Chevron Standard of Review**

        In light of the standards set forth in Chevron, 467 U.S. 837
(1984), the courts review inmates' challenges to the BOP
decisions denying Section 3621(e)(2) reduction of sentence under
the following standard:

> First, always, is the question whether Congress has
> directly spoken to the precise question at issue.  If
> the intent of Congress is clear, that is the end of the
> matter; for the courts, as well as the agency, must
> give effect to the unambiguously expressed intent of
> Congress.  If, however, the court determines Congress
> has not directly addressed the precise question at
> issue, the court does not simply impose its own
> construction on the statute, as would be necessary in
> the absence of an administrative interpretation.
> Rather, if the statute is silent or ambiguous with
> respect to the specific issue, the question for the
> court is whether the agency's answer is based on a
> permissible construction of the statute.

Chevron, 467 U.S. at 842-43 (footnotes omitted).

        Even where the agency construction appears in an
"interpretive" rule not subject to the "notice-and-comment"
procedure of the Administrative Procedure Act, the agency's
interpretive rule is entitled to deference where it is a
permissible construction of the governing statute.   See Reno v.
Koray, 515 U.S. 50, 61 (1995).   In Lopez v. Davis, 531 U.S. 230

(2001), the Supreme Court upheld a related BOP regulation interpreting the phrase "nonviolent offense" and categorically excluding certain types of prisoners from participation in the early-release program.

> Beyond instructing that the Bureau has discretion to reduce the period of imprisonment for a nonviolent offender who successfully completes drug treatment, Congress has not identified any further circumstance in which the Bureau either must grant the reduction, or is forbidden to do so.  In this familiar situation, where Congress has enacted a law that does not answer "the precise question at issue," all we must decide is whether the Bureau, the agency empowered to administer the early release program, has filled the statutory gap "in a way that is reasonable in light of the *legislature's revealed design*."

Lopez, 531 U.S. at 242 (citations omitted, emphasis supplied).

In sum, this Court is without power to second guess the BOP's determination: the Court may overrule the BOP's decision only if the Court determines that the BOP abused its discretion, but the Court may not substitute its judgment for the agency's judgment.  See Chevron, 467 U.S. 837; Koyo Seiko Co. v. United States, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (stating that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another"); see also Negev Phosphates, Ltd. v. U.S. Dep't of Commerce, 699 F. Supp. 938, 942, 12 Ct. Int'l Trade 1074 (1988) (explaining that the court must sustain an agency's determination if it is reasonable and supported by the substantial evidence on the record "as a whole").

## C.   **Rule of Lenity**

Here, Petitioner invokes the rule of lenity.  In general:

If a statute is ambiguous and *punitive in nature*, "the
rule of lenity requires that any ambiguity in the
statute be resolved in favor of the claimant."  United
States v. $ 734,578.82 in United States Currency, 286
F.3d 641, 657 (3d Cir. 2002) (citing United States v.
One 1973 Rolls Royce, 43 F.3d 794, 801 (3d Cir. 1994)).
The rule of lenity, however, is inapplicable if there
is only a mere suggestion of ambiguity because most
"statutes are ambiguous to some degree."  See id. at
658 (internal quotation marks & citation omitted).
Furthermore, any "[j]udicial perception" that the
result in a case is unreasonable may not enter into our
interpretation of an unambiguous statute.  See Comm'r
v. Asphalt Prods. Co., 482 U.S. 117, 121, 107 S. Ct.
2275, 96 L. Ed. 2d  (1987).

United States v. Cheeseman, 2010 U.S. App. LEXIS 4381, at *13 (3d

Cir. Mar. 2, 2010) (emphasis added).[5]

--------

[5] The term "punitive statute" typically implies a criminal
code provision or a provision inviting quasi-criminal-code
consequences.  See Kansas v. Hendricks, 521 U.S. 346 (1997).

[T]he question whether an Act is civil or punitive in
nature is initially one of statutory construction. [See
Hendricks,] 521 U.S. at 361 (citing Allen v. Illinois,
478 U.S. 364, 368, 92 L. Ed. 2d 296, 106 S. Ct. 2988
(1986)).  A court must ascertain whether the
legislature intended the statute to establish civil
proceedings [which would qualify the statute as non-
punitive].  A court will reject the legislature's
manifest intent [to establish civil proceedings] only
where a party challenging the Act provides the clearest
proof that the statutory scheme is so punitive in
either purpose or effect as to negate the State's
intention.  521 U.S. at 361 (citing United States v.
Ward, 448 U.S. 242, 248-249, 65 L. Ed. 2d 742, 100 S.
Ct. 2636 (1980)). . . . [The relevant] factors [are
whether]: The Act did . . . implicate retribution or
deterrence; prior criminal convictions were used as . .
. a prerequisite to confinement; the Act required [a]
finding of scienter to commit a person; the Act was . .

Here, there are two provisions at issue.  One, Section 3621, is an enabling provision governing the BOP's discretionary decisions so far removed from criminal or quasi-criminal context that the issue of Section 3621 being a punitive statute appears facially not viable.[6]  Petitioner's focus on D.C. Code § 23-1331(4) to assert that the rule of lenity should be applied in its construction is equally unavailing.  Section 23-1331 is a mere definition statute, which means that -- regardless of the fact that it deals with definitions of terms utilized in the provisions dealing with criminal offenses -- considering this provision (and its Subsection 4) as a "punitive statute" is unwarranted in light of the guidance provided in Hendricks, 521 U.S. 346, and Cheeseman, 2010 U.S. App. LEXIS 4381.

Moreover, even if Section 23-1331 could, somehow, be qualified as "punitive," its Subsection 4 cannot be qualified as "ambiguous" (as Cheeseman defines that term) as to the meaning of the word "manslaughter".  The legislative history of the statute

_____

. intended to function as a deterrent; and . . . . the procedural safeguards [are so] similar to those in the criminal context [that] they did . . . alter the character of the scheme.  521 U.S. at 361-365.

Seling v. Young, 531 U.S. 250, 261 (2001).

[6] In addition, the rule-of-lenity challenge was already rejected by the Supreme Court when the Court emphasized that, because "the statute cannot be read to prohibit the Bureau from exercising its discretion categorically or on the basis of preconviction conduct, [Petitioner's] reliance on the rule [of lenity] is unavailing."  Lopez, 531 U.S. at 244 n.7.

unambiguously indicates the intent of District of Columbia legislators to include both voluntary and involuntary manslaughter in the statutory definition of "crime of violence." Therefore, absent the kind of ambiguity suggested by Cheeseman, the Subsection is not amenable to application of the rule of lenity.  Consequently, the rule of lenity does not and cannot alter this Court's Chevron analysis.

### D.   Ex Post Facto Clause

Finally, in light of Petitioner's invocation of the Ex Post Facto Clause, a brief overview of the Clause appears warranted. The Ex Post Facto Clause of the U.S. Constitution bars only those "enactments which, by retroactive operation, increase the punishment for a crime after its commission." Garner v. Jones, 529 U.S. 244, 249 (2000) (relying on Lynce v. Mathis, 519 U.S. 433, 445-446 (1997); Cal. Dep't of Corr. v. Morales, 514 U.S. 499, 508-509 (1995); and Collins v. Youngblood, 497 U.S. 37, 42 (1990)).  Thus, a change in law that does not "increase the punishment for a crime" within the meaning of constitutional safeguards cannot, by definition, operate as a violation of the Clause.

### III. JURISDICTION

Section 2241 of Title 28 of the United States Code provides in relevant part:

> (c) The writ of habeas corpus shall not extend to a
>     prisoner unless- . . . He is in custody in

> violation of the Constitution or laws or treaties
> of the United States . . . .

28 U.S.C. § 2241(c)(3).

"Section 2241 is the only statute that confers habeas jurisdiction to hear the petition of a federal prisoner who is challenging not the validity but the execution of his sentence." Coady v. Vaughn, 251 F.3d 480, 485 (3d Cir. 2001). A petition for a writ of habeas corpus under 28 U.S.C. § 2241 in the district where the prisoner is confined provides a remedy "where petitioner challenges the effects of events 'subsequent' to his sentence." Gomori v. Arnold, 533 F.2d 871, 874 (3d Cir. 1976) (challenging erroneous computation of release date); see also Soyka v. Alldredge, 481 F.2d 303 (3d Cir. 1973) (where petitioner alleged a claim for credit for time served prior to federal sentencing). Accordingly, this Court has subject matter jurisdiction under Section 2241 to consider this matter since Petitioner does not challenge the imposition of the sentence, but instead challenges the execution of the sentence, and because Petitioner was confined in New Jersey at the time he filed his Petition.

## IV.   ANALYSIS

### A.   Involuntary Manslaughter as a "Crime of Violence" for the Purposes of RDAP

Neither voluntary nor involuntary manslaughter is defined in the D.C. Code, which provides only for the punishment of manslaughter, in contrast with the United States Code. Compare 18

U.S.C. § 1112(a) (stating that involuntary manslaughter "is the unlawful killing of a human being without malice . . . in the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death") with D.C. Code § 22-2105 (stating that "Whoever is guilty of manslaughter shall be sentenced to a period of imprisonment not exceeding 30 years").

> In the absence of a statutory definition in [D.C.] Code, [District of Columbia] court[s] . . . adopted the general common law definition of manslaughter, and with equal justification for relying upon the common law [they] distinguish voluntary manslaughter . . . from involuntary manslaughter.

Simon v. United States, 424 F.2d 796, 797 (D.C. Cir. 1970) (footnotes omitted).

> Thus, under the District of Columbia law,

> [A] homicide constitutes voluntary manslaughter where the perpetrator kills with a state of mind which, but for the presence of legally recognized mitigating circumstances, would render the killing murder, whereas, involuntary manslaughter occurs when a killing is committed without a specific intent to kill or do serious bodily injury, or . . . conscious disregard of an extreme risk of death or serious bodily injury. . . . The offense of involuntary manslaughter is not limited to those killings in which the perpetrator did not intend the conduct which caused the death, but encompasses those where the conduct was intentionally committed by an actor who should have been, but was not, aware of the risk of death or serious bodily injury.

<u>Donaldson v. United States</u>, 856 A.2d 1068, 1073-74 (D.C. 2004)
(citation and quotation marks omitted).[7]

Operating in the intersection of 18 U.S.C. § 3621(e)(2)
(allowing up-to-one-year reduction of sentence to a prisoner
convicted of a "nonviolent offense"), D.C. Code § 23-1331(4)
(qualifying any manslaughter as a "crime of violence") and the
District of Columbia common-law based regime (allowing for
interpretation of involuntary manslaughter as an act intentionally
committed by the defendant who should have been aware of the risk
of death to the victim), the BOP concluded that Petitioner was
ineligible to the sentence-reducing incentive because, for purposes
of the RDAP program, he committed a "crime of violence."

This Court cannot find that the BOP's determination failed to
be "based on a permissible construction of the statute," <u>Chevron</u>,
467 U.S. at 843, regardless of whether the Court were to examine
the construction in light of the language of 18 U.S.C. § 3621(e)(2)
or D.C. Code § 23-1331(4), or both.   <u>See</u> <u>Blue Ocean Inst. v.
Gutierrez</u>, 585 F. Supp. 2d 36, 44 (D.D.C. 2008) (explaining that
"'a permissible construction of the statute' mean[s] that its

---

[7] Relying on <u>Donaldson</u>, Petitioner asserts that the crime of
"[i]nvoluntary manslaughter is not <u>per</u> <u>se</u> a 'crime of violence'"
because "unlike voluntary manslaughter, involuntary manslaughter
does not require an actual intent to do harm."   Docket Entry No.
1-1, at 9-10.   However, as the language of <u>Donaldson</u> makes clear,
the crime of involuntary manslaughter encompasses conduct that
was *intentionally* committed by the defendant who should have been
aware of the risk of death to the victim.   <u>See</u> <u>Donaldson</u>, 856
A.2d at 1074.

interpretation 'is reasonable and consistent with the statutory purpose and legislative history'") (quoting <u>Natural Res. Def. Council, Inc. v. Daley</u>, 209 F.3d 747, 752 (D.C. Cir. 2000)) (internal citation omitted). Indeed, the legislative history of the D.C. Code unambiguously suggests legislative intent to include involuntary manslaughter in the list of "crimes of violence," and the discretionary blanket exclusion of persons convicted for an offense that could have involved conduct that was intentionally committed cannot be qualified as unreasonable. Nor has Petitioner demonstrated how that interpretation is unreasonable as applied to the circumstances of his conviction and the underlying facts, facts presumably known both to Petitioner and the BOP.

Petitioner's reliance on <u>Leocal v. Ashcroft</u>, 543 U.S. 1 (2004), and its precursors and progeny[8], is misplaced. In <u>Leocal</u>, the Supreme Court addressed the issue of whether driving under the influence is a crime of violence. <u>Id.</u>, 543 U.S. at 3-4. There, Leocal, a Haitian citizen and lawful permanent resident of the United States, had been convicted of driving under the influence, a violation of Florida state law.[9] <u>Id.</u> at 3. While he was serving

_____

[8] See <u>e.g.</u>, <u>Bejarano-Urrutia v. Gonzales</u>, 413 F.3d 444, 447 (4th Cir. 2005); <u>Jobson v. Ashcroft</u>, 326 F.3d 367, 375-76 (2d Cir. 2003); <u>United States v. Chapa-Garza</u>, 243 F.3d 921 (5th Cir. 2001); <u>Bazan-Reyes v. INS</u>, 256 F.3d 600, 609 (7th Cir. 2001); <u>Tran v. Gonzales</u>, 414 F.3d 464, 471 (3d Cir. 2005).

[9] Notably, Leocal was not charged with manslaughter, even involuntary manslaughter. <u>See</u> <u>Leocal</u>, 543 U.S. at 3. The statute under which Leocal was charged and convicted, Fla. Stat.

his sentence, the Immigration and Naturalization Service initiated

removal proceedings, claiming that he had necessarily committed an

aggravated felony and, thus, was automatically deportable under 18

U.S.C. § 16, an immigration law provision.[10]   Id.

The Leocal Court cautiously disagreed, taking pains to observe

as follows:

> While *one may, in theory, actively employ something in an*
> *accidental manner*, it is much less natural to say that a
> person actively employs physical force against another
> person by accident.  Thus, a person would 'use . . .
> physical force against' another when pushing him;
> however, we would not ordinarily say a person 'use[s] .
> . . physical force against' another by stumbling and
> falling into him.

---

§ 316.193(3)(c)(2), is a "[d]riving under the influence"
provision resulting in a felony of the third degree.  The statute
contains a separate provision which provides that a person who
drives under the influence and causes "[t]he death of any human
being . . . commits . . . manslaughter, a felony of the second
degree."  Fla. Stat. § 316.193(3)(c)(3).

[10] Within the immigration law regime, Section 101(a)(43) of
Title VIII defines an aggravated felony to include a crime of
violence as the term "crime of violence" is defined in Section 16
of Title XVIII:

> (a)   an offense that has as an element the use,
>       attempted use, or threatened use of physical force
>       against the person or property of another, or
>
> (b)   any other offense that is a felony and that, by
>       its nature, involves a substantial risk that
>       physical force against the person or property of
>       another may be used in the course of committing
>       the offense.

18 U.S.C. § 16.

Id. at 9 (original emphasis removed, alternative emphasis supplied).

The reasoning of the Leocal Court and the Court's emphasis of the likelihood of the unintentional nature of Leocal's conduct cannot be read outside the context of the regime created by immigration law, the severity of collateral consequence faced by Leocal, i.e., deportation and the very offense that Leocal was convicted of. See United States v. Booker, 555 F. Supp. 2d 218, 222 (D. Me. 2008) ("[S]tressing a point that carried 'significant weight,' Leocal discussed Congress's use of the term 'crime of violence' [as it was defined, specifically,] in the Immigration and Naturalization Act ('INA'). The INA elsewhere defined a 'serious criminal offense' to include a 'crime of violence' and [separately, addressed the issue of] 'any crime . . . of driving under the influence of alcohol . . . if such crime involves personal injury to another.' [The Court in] Leocal found that Congress's separate listing of the crime of driving under the influence causing injury to be 'revealing.'") (quoting Leocal, 543 U.S. at 11-12).

These unique considerations -- especially read in light of the highly cautious language employed by the Court -- renders the holding of Leocal rather narrow and its application outside the context of immigration law subject to doubt, especially here, where

the crime of conviction is both different and also more severe than
the crime addressed in Leocal.[11]

_____

[11] These issues were thoughtfully examined in United States
v. Allen, 409 F. Supp. 2d 622 (D. Md. 2006).  There, defendant --
being charged with being a felon in possession of a firearm --
sought pretrial release.  The government opposed arguing the
charged offense was a crime of violence.  Id. at 623-24.
Defendant, relying on Leocal, asserted that mere possession
cannot qualify as conduct "violent" in its nature, since
possession, in and by itself, encompassed no mens rea to inflict
harm on another human being.  Id. at 630.  The Allen court found
that the possessory offense constituted a "crime of violence" for
purposes of the Bail Reform Act, 18 U.S.C.S. § 3141 et seq.,
reasoning as follows:

> "Leocal [held] . . . that "driving under the influence"
> did not constitute a crime of violence for purposes of
> removal proceedings under the [INA,] 8 U.S.C. § 1227(a)
> (2) (A) (iii), because the state DUI offense neither
> contained a mens rea component nor involved a
> substantial risk that the offender would use physical
> force in completing the crime.  This Court does not
> think that [the Leocal] decision undermines its ruling
> [rendered in the context of pretrial release].  First,
> even though 18 U.S.C. § 16(b) at issue in Leocal and 18
> U.S.C. 3156(a) (4) (2004) of the Bail Reform Act define
> "crime of violence" the same, "statutes and rules
> created in different contexts and for different
> purposes may have different meanings, notwithstanding
> the use of similar words."  United States v. Powers,
> 318 F. Supp. 2d 339, 342 (W.D. Va. 2004) (citing United
> States v. Dillard, 214 F.3d 88, 92-93 (2d Cir. 2000)
> (comparing definition of crimes of violence under the
> Sentencing Guidelines with the Bail Reform Act
> definition).  Here, . . . practical and legal
> differences exist between designating the offense as a
> crime of violence in removal proceedings and merely
> permitting the conduct of a pretrial detention hearing
> under the Bail Reform Act.

Id. (citations omitted).  Here, any importation of the holding of
Leocal is even less warranted than in Allen, since D.C. Code §
23-1331 utilizes the definition of "crime of violence" in a
qualitatively different way -- both in its language and in its
overall approach to the definition -- from that used in 18 U.S.C.

Indeed, this very scenario was addressed by a district court in the Fourth Circuit in <u>McAloney v. Gutierrez</u>, 557 F. Supp. 2d 694 (N.D. W. Va. 2007). In that case, the Petitioner, as in the case at bar, challenged the BOP's decision to allow him participation in the local RDAP but denying him the incentive-based sentence reduction. <u>See</u> <u>id.</u> Being convicted of conspiracy to manufacture and distribute explosive material without a license, Petitioner relied on <u>Leocal</u> asserting that the denial violated his rights since the crime he was convicted of should not have been deemed a "crime of violence" in light of the holding of <u>U.S. v. Hull</u>, 456 F.3d 133 (3d Cir. 2006). In that case the Third Circuit Court of Appeals vacated a sentence concluding that the jury instructions given were erroneous because the mere possession of a pipe bomb was not a crime of violence. <u>See</u> <u>id.</u> at 705. However, the <u>McAloney</u> court observed that, while it was reasonable for the <u>Hull</u> court to look at 18 U.S.C. § 16 and follow <u>Leocal</u> in the context of that case, that reasoning was inapplicable in the context of an RDAP-based decision to deny an incentive-based discretionary sentence reduction:

---

§ 16(b), and -- in addition -- the D.C. Code does not even define the term "involuntary manslaughter," in stark contrast with 18 U.S.C. § 1112 that provides a precise definition of all the elements. Consequently, any comparison of the D.C. Code to 18 U.S.C. § 16, or the immigration regime to the BOP's administration of the RDAP program to inmates, presents the proverbial comparison of apples to oranges.

However, for purposes of the RDAP, the Fourth Circuit has determined that courts are not required to look to 18 U.S.C. § 16's definition of "crime of violence" to determine whether the BOP's categorization of offenses is appropriate. In Cunningham v. Scibana, 259 F.3d 303 (4th Cir. 2001), the petitioner argued that her underlying offense of tampering with consumer products in violation of 18 U.S.C. § 1365(a) was not properly categorized by the BOP as a crime of violence. More specifically, she argued that her offense did not include the use of physical force, and therefore, did not constitute a "crime of violence" as defined by 18 U.S.C. § 16. Therefore, she argued that she had been improperly denied consideration for early release upon completion of RDAP. After discussion of the semantics of "nonviolent offense" as used in 18 U.S.C. § 3621(e), versus "crime of violence" as used in other statutes, the Fourth Circuit concluded that the BOP was not bound by "§ 16's definition of 'crime of violence' for purposes of interpreting what a 'nonviolent offense' means in § 3621(e)." Id. at 308. The court went on to find that the BOP's decision to classify [certain groups of] convictions . . . as violent in all cases was "supported by experience and sound and consistent reasoning." This same reasoning applies to the BOP's decision to classify [the petitioner's] conviction . . . as violent in all cases.

Id. at 705-06.

This Court finds the reasoning of McAloney, Allen, and similar decisions both sound and persuasive.[12]   Therefore, Petitioner's challenges based on the semantics of the term "involuntary" will be dismissed.  That leaves the Court only with Petitioner's challenges

---

[12] We note that the Northern District of West Virginia adopted Magistrate Judge Seibert's recommendations without altering or even considering the holding of Bejarano-Urrutia v. Gonzales, 413 F.3d 444, 447 (4th Cir. 2005), indicating that the holding of Leocal and its limited progeny was inapposite to the challenges raised within the context of the RDAP. See McAloney v. Gutierrez, 557 F. Supp. 2d 694 (N.D. W. Va. 2008).

under the Ex Post Facto Clause.  However, Petitioner's position to that effect fares no better.

**B.  Ex Post Facto Safeguards Are Inapplicable to the Case at Bar**

As noted supra, the Ex Post Facto Clause bars only those "enactments which, by retroactive operation, increase the punishment for a crime after its commission." Garner, 529 U.S. at 249.  Respondent here duly points out that the April 24, 2007, inclusion of "involuntary manslaughter" into D.C. Code § 23-1331 (by means of the legislative decision to remove qualifier "voluntary" from the term "manslaughter") did not increase the sentence imposed upon Petitioner after he took his guilty plea in the sense that the sentence remained the same, i.e., 40 months of imprisonment.[13]  See Docket Entry No. 7, at 12.

While it is true that certain "sentence-execution" provisions might qualify as violations of the Ex Post Facto Clause, such provisions must have a due process right attached in order to trigger an ex post facto inquiry.  For instance, parole regulations could be "laws" for purposes of ex post facto analysis, see, e.g.,

---

[13] Respondent also observes, quite correctly, that Respondent did not enact the amendment to the D.C. Code; rather, the amendment was produced by a third party, here, the District of Columbia legislators.  See Docket Entry No. 7, at 11.  However, the Court presumes that Petitioner's ex post facto challenges are based on Respondent's utilization of the amended law.  Such reading renders Respondent's position that "the ex post facto clause, which deals specifically with the effects of retroactive laws, would not apply [here]," id., unwarranted.

<u>Richardson v. Pa. Bd. of Prob. & Parole</u>, 423 F.3d 282, 284 (3d Cir. 2005); <u>Mickens-Thomas v. Vaughn</u>, 321 F.3d 374, 384 (3d Cir. 2003); <u>Royster v. Fauver</u>, 775 F.2d 527, 534-35 (3d Cir. 1985); <u>United States ex rel. Forman v. McCall</u>, 709 F.2d 852 (3d Cir. 1983), since there is a vested federally-created and state-created liberty interest in the expectancy of release on parole at the time of parole eligibility, absent the requisite finding that one of the justifications for deferral exists.  See <u>Greenholtz v. Inmates of Neb. Penal and Corr. Complex</u>, 442 U.S. 1, 7-12 (1979); <u>Watson v. DiSabato</u>, 933 F. Supp 390, 392-93 (D.N.J. 1996); <u>McCray v. Dietz</u>, 517 F. Supp. 787, 790 (D.N.J. 1980).  However, the Supreme Court has made it clear that -- unless such vested liberty interest exists -- a prisoner has no protected right in being released before the completion of a valid sentence.  See, e.g., <u>Sandin v. Conner</u>, 515 U.S. 472, 484 (1995); <u>Greenholtz</u>, 442 U.S. at 7.  In fact, directly on point with this case, several courts have found that there is no protected liberty interest in discretionary early release under 18 U.S.C. § 3621(e) for completion of the RDAP.  See <u>Cook v. Wiley</u>, 208 F.3d 1314, 1322-23 (11th Cir. 2000); <u>Venegas v. Henman</u>, 126 F.3d 760, 765 (5th Cir. 1997); <u>Jacks v. Crabtree</u>, 114 F.3d 983, 986 n.4 (9th Cir. 1997); <u>Fonner v. Thompson</u>, 955 F. Supp. 638, 642 (N.D. W. Va. 1997).  Indeed, Respondent correctly observes that "[c]ourts have determined that 18 U.S.C. § 3621(e) confers [merely] *additional benefits* to certain inmates and in no way

[qualifies as an] increase in punishment." Docket Entry No. 7, at 12 (citing <u>Santos v. Beeler</u>, 40 F. Supp. 2d 566, 574 (D.N.J. 1999), and <u>Yates v. Sherman</u>, 2007 U.S. Dist. LEXIS 49700 (W.D. Pa. 2007)) (emphasis supplied).

Consequently, Petitioner's ex post facto challenges are facially without merit and should be denied as such.  In light of the foregoing, the Petition will be dismissed in its entirety.

**V.   CONCLUSION**

For the foregoing reasons, the Petition, Docket Entry No. 1, will be dismissed.  An appropriate Order accompanies this Opinion.


                                    /s/ NOEL L. HILLMAN
                                   **NOEL L. HILLMAN, U.S.D.J.**


Dated:    June 16, 2010